1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PETER MANUEL ARTEAGA, II,                No.  2:11-cv-3181 GEB DAD P

12                   Petitioner,

13         v.

14   MARTIN BITER, Warden,[1]                  FINDINGS AND RECOMMENDATIONS

15                   Respondent.

16

17         Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him

19   on May 15, 2008 in the San Joaquin County Superior Court on charges of attempted first degree

20   murder, first degree home invasion robbery, and first degree burglary.  He seeks federal habeas

21   relief on the following grounds:  (1) his trial counsel rendered ineffective assistance; (2) his

22   conviction was not supported by sufficient evidence; (3) one of the prosecution trial witnesses

23   was "coerced" by the prosecution; (4) his constitutional rights were violated by the prosecutor's

24   improper use of peremptory challenges to exclude one African American and one Hispanic from

25   _____

26   [1]  In his amended petition petitioner named Warden G.D. Lewis as the respondent in this federal
     habeas action.  (ECF No. 12.)  The court now substitutes in the correct respondent, the Warden of
27   Kern Valley State Prison, where petitioner is presently incarcerated.  See Stanley v. California
     Supreme Court, 21 F.3d 359, 360 (9th Cir.1994) (citing Rule 2(a), 28 U.S.C. foll. § 2254) ("A
     petitioner for habeas corpus relief must name the state officer having custody of him or her as the
28   respondent to the petition").  See also Smith v. Idaho, 392 F.3d 350, 355-56 (9th Cir. 2004).

                                                   1

1    the jury; and (5) the trial court violated his right to due process in refusing to reopen closing

2    arguments or give further jury instructions in order to clarify the issue of aiding and abetting for

3    the jury.  Upon careful consideration of the record and the applicable law, the undersigned will

4    recommend that petitioner's application for habeas corpus relief be denied.

5    **I. Background**

6          In its unpublished memorandum and opinion affirming petitioner's judgment of

7    conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

8    following factual summary:

> A jury found defendant Peter Manuel Arteaga guilty of the attempted first degree murder of Robert Shetterly (Pen. Code, §§ 664/187, subd. (a))[2], the first degree home invasion robbery of Dean Shetterly[3] (§§ 211, 212.5, subd. (a)), the first degree home invasion robbery of Robert, and first degree burglary (§ 459).  The jury also found true allegations defendant acted in concert with two or more other persons in committing the robberies.  (§ 213, subd. (a)(1)(A).)  The jury found not true allegations defendant personally inflicted great bodily injury on Robert during the commission of the attempted murder and robbery.  (§12022.7, subd. (a.).)  In a bifurcated proceeding, the trial court found true allegations defendant's prior conviction for attempted first degree burglary constituted a serious felony (§ 667, subd. (a)(1)) and qualified as a strike (§§ 667, subd. (d); 1170.12, subd. (b)).  The trial court denied defendant's motion to dismiss his prior strike conviction and sentenced him to life with the possibility of parole, plus 17 years in prison.[4]
>
> Defendant was awarded 504 days of presentence custody credit.  The recent amendments to Penal Code section 4019 do not operate to modify defendant's entitlement to credit, as he was committed for a serious felony as defined in section 1192.7.  (§ 4019, subds.(b), (c); Stats.2009-2010, 3d Ex.Sess., ch. 28, § 50.)

21   /////

22

---

23   [2]   Further undesignated section references are to the Penal Code.

24   [3]   We refer to Robert and Dean Shetterly by their first names to avoid confusion.  No disrespect
25   is intended.

26   [4]   Defendant was sentenced to life with the possibility of parole for the attempted murder, plus
27   five years for his prior conviction; and a consecutive 12 years (twice the middle term) for the first
     degree home invasion robbery of Dean.  Sentences on the remaining counts were stayed pursuant
28   to section 654.

Defendant appeals, contending the trial court erroneously denied his Wheeler-Batson[5] motion; his attempted murder conviction is not supported by sufficient evidence; his sentence for attempted murder must be reduced because there is insufficient evidence of deliberation and premeditation; the trial court abused its discretion in denying his request to reopen closing argument; and the trial court erred in denying his motion to dismiss his prior strike conviction as untimely.   We shall conclude that only the last contention has merit, affirm defendant's convictions, vacate his sentence, and remand the matter to the trial court to allow it to consider in its discretion whether to dismiss the prior strike conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize the evidence in the light most favorable to the judgment.  (People v. Davis (1995) 10 Cal.4th 463, 509.)

At all relevant times, Dean was living with his father Robert in Lathrop.  On August 4, 2007, Dean returned home around 2:00 a.m. accompanied by Angela Smith.  Robert and Guillermo Riberal, a friend of Dean's, were there when they arrived, and Rachel Mount, a roommate, arrived a short time later.  Dean went to bed not long after he returned home.

Thereafter, as Smith was attempting to leave, defendant, Jimmy Rodriguez, and another man pulled up in front of the house "throwing beer bottles and screaming and yelling and just acting totally belligerent."  The men got out of the car and rushed inside the house.  Rodriguez dragged Dean out of bed, shoved him into the laundry room, and asked, "Where's the thousand dollars at?"  Dean handed Rodriguez his wallet and some additional cash.  At that point, Robert entered the room, and Rodriguez "grabbed him around the back of the head . . . ."  Robert said, "Look, if [Dean] owes you guys anything or money . . . I'll take care of it. Just don't hurt my kid."

One of the other two men again demanded one thousand dollars from Dean.  When Dean said he did not know what the man was talking about, the man began hitting him.  The man then threw Dean in his room, got on top of him, and threatened to stab him if he kept moving.  Dean eventually broke free, ran out the front door, and jumped over a fence into a neighbor's backyard.  He then climbed through an open window and hid.  He soon was discovered by his neighbor, who telephoned law enforcement.

Meanwhile, defendant, Rodriguez, and the third man pushed and kicked Robert across a patio and into a shed in the backyard, where they took turns beating Robert and raping Smith.  That lasted about an hour.  During the attack, Robert was struck with a cast iron frying pan, a ball peen hammer and a block of wood.  Defendant

---

[5]   People v. Wheeler (1978) 22 Cal.3d 258; Batson v. Kentucky (1986) 476 U.S. 79 [90 L.Ed.2d 69].

and the third man "hit [Robert] with just about whatever they could get their hands on." Defendant repeatedly struck Robert in the head with a block of wood. "[E]very time [Robert] would make a sound, [defendant] would just hit him again with it." Rodriguez kicked Robert over 20 times; he did not hit him with any objects. All three men beat Robert, "[b]ut the guy [that was not on trial] is the one that just about killed him."

At approximately 4:00 a.m., sheriff's deputies responded to the neighbor's call. They found Dean hiding in the bathroom. He explained that he had been awakened at his home by someone who beat him and took his wallet and that he had fled to his neighbor's home to hide. Deputies placed Dean in their patrol car and went to his home to confirm his story.

When deputies arrived at Dean's home, the front door was open, and there were three cars in the driveway, including a Toyota Camry with one of its rear doors open. The Toyota was registered to defendant, and defendant's driver's license and paperwork bearing his name were found inside the car.

As deputies approached the house, they heard the front door slam shut. At that point, they called for backup. Additional deputies arrived a few minutes later and secured the scene. Deputies heard some noises and thought someone may have left through an alley behind the house. Deputies knocked on the door and a few minutes later Mount answered. She was scared and had been hiding. She was the only person inside the house.

Deputies found Robert, Smith, and Rodriguez in the shed behind the house. Robert was lying on his back in a pool of blood. His face and head were covered in blood, and there were lacerations on the top of his head. He was semiconscious, moaning, and had trouble speaking. Deputies found a crowbar with a piece of cloth wrapped around one end, a cast iron frying pan that was dented on the bottom and appeared to have dried blood and hair stuck to it, and a block of wood with blood on it in the shed.

Rodriguez and Smith were having sexual intercourse approximately three feet away from Robert in the shed. The deputy who discovered them testified that the intercourse appeared to be consensual. Dean's wallet and Robert's keys were found in Rodriguez's pocket.

Smith told one of the deputies she had been raped and was taken to the hospital for a sexual assault exam. The DNA from two individuals was found on a vaginal swab taken from Smith. There was one major and one minor contributor. The profile of the major contributor was the same as Smith's own profile, and Rodriguez could not be excluded as a minor contributor. Defendant was eliminated as a contributor. There was a mixture of DNA from at least three individuals on Smith's panties, consistent with one major and at least two minor contributors. The profile of the major contributor was the same as Rodriguez's profile. The profile of one of the minor contributors was the same as defendant's profile.

4

Smith could not be excluded as the second minor contributor. Finally, DNA from at least three contributors was found on Smith's shorts. The major contributor's profile was the same as Rodriguez's, and neither defendant nor Smith could be excluded as minor contributors. The probability that a random person would possess the same profile as the major contributor is 1 in 130 quintillion African Americans; 1 in 3 sextillion Caucasians; and 1 in 1.4 sextillion Hispanics. As for the mixtures that contained at least three contributors, the probability that a random person would possess a profile that was included in that mixture is 1 in 2.2 billion African Americans; 1 in 540 million Caucasians; and 1 in 450 million Hispanics.

Robert was taken to the hospital and found to have multiple skull fractures, some of which were depressed. There was bleeding in and around his brain. He also had numerous lacerations on his scalp, fractured ribs, and bleeding in his chest. When he arrived at the hospital, he was nonresponsive and remained unconscious for several days. He was in the hospital for approximately two weeks and spent most of that time in the intensive care unit.

Defendant was taken into custody roughly two weeks after the incident. He said he had been drinking with his cousin in Stockton on the night in question and ended up at a party in Lathrop. He was "pretty intoxicated" and could not remember where the party was or who was there. At some point, he fell and someone took his car keys. He slept at his mother's house in Lathrop; he was living there at the time. When he woke up the next morning, he did not know where his car was. He did not know Dean, Robert, or Smith.

Defendant and Rodriguez were each charged with first degree attempted murder, two counts of first degree home invasion robbery, and first degree burglary. It was further alleged that defendant and Rodriguez personally inflicted great bodily injury on Robert. Defendant and Rodriguez were tried together. With the exception of the great bodily injury allegations, the jury found defendant guilty as charged. The jury was unable to reach a verdict as to Rodriguez on the attempted murder charge. With the exception of the great bodily injury allegation, the jury otherwise found Rodriguez guilty as charged.

(ECF No. 25-1(Opinion) at 1-7.)

## II. Analysis

### A. **Standards of Review Applicable to Habeas Corpus Claims**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010);

1 | Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir.

2 | 2000).

3 |      Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

4 | corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, ___ U.S. ___, 132 S. Ct. 38 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. [6] Lockyer v.

---

[6] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

1    *Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002

2    (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that

3    court concludes in its independent judgment that the relevant state-court decision applied clearly

4    established federal law erroneously or incorrectly.  Rather, that application must also be

5    unreasonable."  *Williams*, 529 U.S. at 412.  *See also* *Schriro v. Landrigan*, 550 U.S. 465, 473

6    (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

7    review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

8    "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

9    'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v.*

10   *Richter*, 562 U.S.___, ___,131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S.

11   652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

12   court, a state prisoner must show that the state court's ruling on the claim being presented in

13   federal court was so lacking in justification that there was an error well understood and

14   comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*,131

15   S. Ct. at 786-87.

16       If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

17   court must conduct a de novo review of a habeas petitioner's claims.  *Delgadillo v. Woodford*,

18   527 F.3d 919, 925 (9th Cir. 2008); *see also* *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

19   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

20   2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

21   de novo the constitutional issues raised.").

22       The court looks to the last reasoned state court decision as the basis for the state court

23   judgment.  *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

24   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

25   previous state court decision, this court may consider both decisions to ascertain the reasoning of

26   the last decision.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a

27   federal claim has been presented to a state court and the state court has denied relief, it may be

28   presumed that the state court adjudicated the claim on the merits in the absence of any indication

7

or state-law procedural principles to the contrary." Richter, 131 S. Ct. at 784-85.  This

presumption may be overcome by a showing "there is reason to think some other explanation for

the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797,

803 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

but does not expressly address a federal claim, a federal habeas court must presume, subject to

rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S. ___,

___, 133 S. Ct. 1088, 1091 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to

support its conclusion, a federal habeas court independently reviews the record to determine

whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

Thompson, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

review of the constitutional issue, but rather, the only method by which we can determine whether

a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853.  Where no

reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

reasonable basis for the state court to deny relief." Richter, 131 S. Ct. at 784.

When it is clear, however, that a state court has not reached the merits of a petitioner's

claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

**B.  Petitioner's Claims**

**1.  Ineffective Assistance of Counsel**

Petitioner's first claim for federal habeas relief is that his trial counsel rendered ineffective

assistance in failing to:  (1) "investigate or perform certain pretrial functions;" (2) "use important

evidence or testimony at trial;" (3) call "key witnesses from the crime scene" or conduct "forensic

lab testing" on DNA evidence; (4) call a "forensic specialist" as a witness or challenge the DNA

evidence presented at trial; (5) impeach prosecution witness Angela Smith with "available records

of prior testimony;" and (6) "call anyone to the stand in defense of petitioner."  (ECF No. 12

(Am. Pet.) at 5.)  In state court, petitioner had claimed that his trial counsel rendered ineffective

1  assistance in failing to:  (1) " investigate or perform certain pretrial functions;" (2) call Guillermo

2  Riberal as a witness at trial, "thereby losing a key witness for the defense;" (3) request a

3  continuance in order to have a defense expert separately test the DNA evidence and collect DNA

4  evidence from other suspects, and failing to call a defense forensic expert as a witness; and (4)

5  impeach prosecution witness Angela Smith with her prior testimony.  (Resp't's Lod. Doc. 8.)

6  Relief with respect to these latter claims was summarily denied by the California Supreme Court

7  on habeas review.  (Resp't's Lod. Doc. 9.)

8  **a. Legal Standards Regarding Ineffective Assistance of Counsel**

9  The clearly established federal law for ineffective assistance of counsel claims is

10  Strickland v. Washington, 466 U.S. 668 (1984).  To succeed on a Strickland claim, a defendant

11  must show that (1) his counsel's performance was deficient and that (2) the "deficient

12  performance prejudiced the defense."  Id. at 687.  Counsel is constitutionally deficient if his or

13  her representation "fell below an objective standard of reasonableness" such that it was outside

14  "the range of competence demanded of attorneys in criminal cases."  Id. at 687–88 (internal

15  quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a

16  fair trial, a trial whose result is reliable.'"  Richter, 131 S. Ct. at 787-88 (quoting Strickland, 466

17  U.S. at 687).

18  A reviewing court is required to make every effort "to eliminate the distorting effects of

19  hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

20  conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 669; see Richter, 131 S.

21  Ct. at 789.  Reviewing courts must "indulge a strong presumption that counsel's conduct falls

22  within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  There

23  is in addition a strong presumption that counsel "exercised acceptable professional judgment in

24  all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

25  Strickland, 466 U.S. at 689).  This presumption of reasonableness means that the court must "give

26  the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of

27  possible reasons [defense] counsel may have had for proceeding as they did."  Cullen v.

28  /////

9

1    Pinholster, ___ U.S. ___, 131 S. Ct. 1388, 1407 (2011) (internal quotation marks and alterations

2    omitted).

3         Defense counsel has a "duty to make reasonable investigations or to make a reasonable

4    decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691.  Counsel

5    must, "at a minimum, conduct a reasonable investigation enabling him to make informed

6    decisions about how best to represent his client." Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th

7    Cir. 1995) (quoting Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citation and

8    quotations omitted).  See also Porter v. McCollum, 558 U.S. 30, ___, 130 S. Ct. 447, 453 (2009)

9    (counsel's failure to take "even the first step of interviewing witnesses or requesting records" and

10   ignoring "pertinent avenues for investigation of which he should have been aware" constituted

11   deficient performance).  On the other hand, where an attorney has consciously decided not to

12   conduct further investigation because of reasonable tactical evaluations, his or her performance is

13   not constitutionally deficient.  See Siripong v. Calderon, 133 F.3d 732, 734 (9th Cir. 1998)

14   (Siripong II); Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998); Hensley v. Crist, 67

15   F.3d 181, 185 (9th Cir. 1995).  "A decision not to investigate thus 'must be directly assessed for

16   reasonableness in all the circumstances.'" Wiggins v. Smith, 539 U.S. 510, 533 (200) (quoting

17   Strickland, 466 U.S. at 691).

18        A reviewing court must "examine the reasonableness of counsel's conduct 'as of the time

19   of counsel's conduct.'" United States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting

20   Strickland, 466 U.S. at 690).  Furthermore, "'ineffective assistance claims based on a duty to

21   investigate must be considered in light of the strength of the government's case.'" Bragg v.

22   Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (quoting Eggleston v. United States, 798 F.2d 374,

23   376 (9th Cir. 1986)).  See also Rhoades v. Henry, 638 F.3d 1027, 1036 (9th Cir. 2011) (counsel

24   did not render ineffective assistance in failing to investigate or raise an argument on appeal where

25   "neither would have gone anywhere")

26        Under AEDPA, "[t]he pivotal question is whether the state court's application of the

27   Strickland standard was unreasonable." Richter, 131 S. Ct. at 785.  "[B]ecause the Strickland

28   standard is a general standard, a state court has even more latitude to reasonably determine that a

1   defendant has not satisfied that standard."  Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).

2   Prejudice is found where "there is a reasonable probability that, but for counsel's

3   unprofessional errors, the result of the proceeding would have been different."  Strickland, 466

4   U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

5   outcome."  Id.  "The likelihood of a different result must be substantial, not just conceivable."

6   Richter, 131 S. Ct. at 792.

7   **b.  Failure to Investigate**

8   Petitioner's claims regarding the alleged failure of his trial counsel to conduct sufficient

9   investigation should be rejected as unduly vague and conclusory and due to the absence of a

10   showing prejudice.  Petitioner's arguments that his trial counsel failed to "investigate or perform

11   certain pretrial functions," failed to "use important evidence or testimony at trial," and failed to

12   conduct "forensic lab testing" on DNA evidence, without any factual support, are insufficient to

13   establish his entitlement to federal habeas relief.  In particular, petitioner has failed to specify the

14   "pretrial functions," the "important evidence or testimony," and the "forensic lab testing" to

15   which he refers in his application for federal habeas relief.  "'Conclusory allegations which are

16   not supported by a statement of specific facts do not warrant habeas relief.'"  Jones v. Gomez, 66

17   F.3d 199, 204 (9th Cir. 1995) (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)).  Indeed, in

18   light of the vague nature of these claims as presented by petitioner, this court is unable to address

19   them in any more thorough of a manner.

20   Petitioner has also failed to demonstrate prejudice with respect to this aspect of his

21   ineffective assistance of counsel claims.  There is simply no evidence before this court that

22   further investigation, including investigation into DNA evidence found at the scene or obtained

23   from other possible suspects, would have resulted in evidence or information that would have

24   changed the outcome of petitioner's trial.  In state court, petitioner contended that police found a

25   fingerprint belonging to Steve Guerrero, petitioner's cousin, on petitioner's vehicle which was

26   found at the Shetterly residence.  (Resp't's Lod. Doc. 8 at "page 4 of 9.")  Petitioner argued that

27   this raised a question whether the DNA found at the crime scene that was attributed to petitioner

28   may have actually been Guerrero's DNA.  (Id.)  These speculative assertions, which are not

1   supported by any evidence, do not support a finding that petitioner's trial counsel's failure to have

2   additional tests conducted on the DNA evidence, or to collect DNA evidence from Guerrero or

3   anyone else, would have resulted in a different verdict at petitioner's trial.

4       Because petitioner has failed to show that his trial counsel's performance was deficient, or

5   that any deficient performance resulted in prejudice, he is not entitled to federal habeas relief on

6   these claims of ineffective assistance of counsel.

7                    **c. Failure to Call Witnesses**

8       Petitioner's claim that his trial counsel rendered ineffective assistance in failing to call

9   witnesses at his trial, including Guillermo Riberal, should also be rejected due to petitioner's

10  failure to make any showing of prejudice.  Without evidence as to what additional witnesses

11  would have testified to at trial, a habeas petitioner cannot establish prejudice with respect to a

12  claim of ineffective assistance of counsel for failing to call trial witnesses.  See Dows v. Wood,

13  211 F.3d 480, 486-87 (2000) (no ineffective assistance of counsel for failure to call an alleged

14  alibi witnesses where petitioner did not identify an actual witness, did not provide evidence that

15  the witness would have testified, nor presented an affidavit from the alleged witness he claimed

16  should have been called); Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) (same); United

17  States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance because of

18  counsel's failure to call a witness where, among other things, there was no evidence in the record

19  that the witness would testify); United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987)

20  (appellant failed to satisfy the prejudice prong of an ineffectiveness claim because he offered no

21  indication of what potential witnesses would have testified to or how their testimony might have

22  changed the outcome of the hearing).  Here, petitioner has failed to demonstrate that the

23  testimony of any additional witnesses would have changed the outcome of his trial.

24      Petitioner attached an exhibit to his state habeas petition which reflected that Mr. Riberal

25  told police he saw three or four people go into the Shetterly residence on the night of the assault

26  but did not recognize any of them.  (Resp't's Lod. Doc. 8 at "Page 4 of 6.")  Petitioner implied in

27  that petition that if Riberal had been called as a witness at his trial and testified that he did not

28  recognize petitioner among that group of three of four people, this testimony would have

1    established that petitioner was not one of the perpetrators of the crimes at the Shetterly residence.

2    However, there is no evidence before this court that Riberal would have agreed to testify or that

3    he would have testified in the manner that petitioner suggests.  The court notes, in this regard, that

4    in that same conversation with police Riberal was extensively cross-examined about his statement

5    that he didn't recognize petitioner, given that Riberal admitted he knew petitioner's brother

6    Vincent, Riberal and petitioner lived in Lathrop and "ran in the same gang circles," and Riberal's

7    sister had several children with Vincent.  (Id.)  It is entirely possible that petitioner's trial counsel

8    investigated the possibility of calling Riberal as a witness but determined that his testimony was

9    not credible and would not be helpful to the defense.  In any event, petitioner has failed to

10   demonstrate that his trial counsel's failure to call Riberal to the witness stand prejudiced him in

11   any way.  Accordingly, he is not entitled to federal habeas relief on this aspect of his ineffective

12   assistance of counsel claim.

13                              **d.  Failure to Impeach Angela Smith**

14           Petitioner also claims that his trial counsel rendered ineffective assistance in failing to

15   impeach witness Angela Smith with her allegedly inconsistent prior statements.  (Am. Pet. at 5.)

16   Petitioner does not explain which portions of Smith's testimony he claims were false and/or

17   inconsistent or how Smith's trial testimony was contradicted by her prior statements.

18   Accordingly, petitioner's claim in this regard is simply too vague and conclusory to warrant

19   federal habeas relief.  Jones, 66 F.3d at 204; James, 24 F.3d at 26.  In any event, as noted by

20   respondent, petitioner's trial counsel extensively cross-examined Angela Smith at trial about

21   inconsistencies between aspects of her trial testimony and previous statements she had made to

22   police.  (See, e.g., Reporter's Transcript on Appeal (RT) at 692-718, 790-92.)  The record before

23   this court does not reflect that further cross-examination of Ms. Smith on this point was necessary

24   or warranted.  Because petitioner has failed to demonstrate deficient performance on the part of

25   his trial counsel or prejudice flowing therefrom, he is not entitled to federal habeas relief on this

26   aspect of his ineffective assistance of counsel claim.

27   /////

28   /////

13

## 2. Insufficient Evidence

Petitioner's next claim is entitled "Insufficiency of the Evidence of Premeditation." (Am. Pet. at 7.) In support of this claim, petitioner makes the following arguments:

> There is insufficient evidence of deliberation and premeditation. No type of fingerprints or DNA were found on weapons belonging to Mr. Arteaga. The home owners did not identify Mr. Arteaga. The description of the suspects does not even come close to Mr. Arteaga. For Mr. Arteaga looks that of a bald white male. Not Hispanic with short or long hair. Also Mr. Arteaga had no connection to the victims and had no type of motive.

(Id.) As respondent points out, although petitioner's claim is captioned "insufficiency of the evidence of premeditation and deliberation," petitioner actually appears to be arguing that the evidence introduced at his trial was insufficient to support a finding that he was the person who committed the crimes. Respondent argues that this claim challenging the sufficiency of the evidence identifying petitioner as one of the perpetrators has not been exhausted in state court and should therefore be rejected. (ECF No. 25 (Answer) at 23.)

### a. State Court Decision

In affirming his judgment of conviction the California Court of Appeal rejected petitioner's argument that the evidence introduced at his trial was insufficient to show premeditation and deliberation on his part. The court reasoned as follows:

> Defendant claims his sentence for attempted murder must be reduced because there is insufficient evidence of premeditation and deliberation. He argues that "[a]t most, the evidence shows only an unplanned, impulsive act." We disagree.
>
> As a preliminary matter, "[w]e do not distinguish between attempted murder and completed first degree murder for purposes of determining whether there is sufficient evidence of premeditation and deliberation." (People v. Herrera (1999) 70 Cal.App.4th 1456, 1463, fn. 8.)
>
> "All murder which is perpetrated . . . by any . . . kind of willful, deliberate, and premeditated killing . . . is murder of the first degree." (§ 189.) In the context of first degree murder, "'[t]he word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word "premeditated" means considered beforehand.'" (People v. Perez (1992) 2 Cal.4th 1117, 1123, quoting CALJIC No. 8.20 with approval.) "Premeditation and deliberation do not require an extended period

14

1

2

> of time, merely an opportunity for reflection."  (People v. Cook (2006) 39 Cal.4th 566, 603.)

3

4

5

6

7

> In People v. Anderson (1968) 70 Cal.2d 15, 27 (Anderson), the California Supreme Court articulated factors to consider in assessing the sufficiency of evidence to prove that a murder was premeditated and deliberate.  "[T]he Anderson court identified three categories of evidence pertinent to the determination of premeditation and deliberation:  (1) planning activity, (2) motive, and (3) manner of killing."  (People v. Perez, supra, 2 Cal.4th at p. 1125.)  However, the court later emphasized that "[t]he Anderson factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive."  (Ibid.)

8

9

10

11

12

13

14

> Viewed most favorably to the judgment, the evidence shows:  (1) defendant and his cohorts went to the Shetterlys' home to collect on a debt owed by Dean; (2) after Robert offered to settle any debt owed by Dean, one or more of the men pushed and kicked him across a patio and into a shed; (3) once inside the shed, the men, including defendant, alternated between beating Robert and raping Smith; (4) Robert was beaten with a variety of objects; and (5) the beating occurred over an extended period of time and continued long after Robert was completely incapacitated.  This sequence of events shows a calculated and ruthlessly executed plan designed to ensure death, rather than an unconsidered impulsive act of violence.  Even under Anderson, this is sufficient.

15

(Opinion at 12-14.)

16

### b.  Applicable Legal Standards

17

The Due Process Clause "protects the accused against conviction except upon proof

18

beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

19

charged."  In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a

20

conviction if, "after viewing the evidence in the light most favorable to the prosecution, any

21

rational trier of fact could have found the essential elements of the crime beyond a reasonable

22

doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under

23

Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a

24

reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443

25

U.S. at 318).  Put another way, "a reviewing court may set aside the jury's verdict on the ground

26

of insufficient evidence only if no rational trier of fact could have agreed with the jury."  Cavazos

27

v. Smith, ___ U.S. ___, 132 S. Ct. 2, 4 (2011).

28

/////

15

1    In conducting federal habeas review of a claim of insufficient evidence, "all evidence

2    must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d

3    1112, 1115 (9th Cir. 2011). "Jackson leaves juries broad discretion in deciding what inferences

4    to draw from the evidence presented at trial," and it requires only that they draw "'reasonable

5    inferences from basic facts to ultimate facts.'" Coleman v. Johnson,___ U.S. ___, 132 S. Ct.

6    2060, 2064 (2012) (citation omitted). "'Circumstantial evidence and inferences drawn from it

7    may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995)

8    (citation omitted).

9    "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging

10    the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

11    Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant relief, the federal habeas

12    court must find that the decision of the state court rejecting an insufficiency of the evidence claim

13    reflected an objectively unreasonable application of Jackson and Winship to the facts of the case.

14    Ngo, 651 F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13. Thus, when a federal habeas court

15    assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA, "there

16    is a double dose of deference that can rarely be surmounted." Boyer v. Belleque, 659 F.3d 957,

17    964 (9th Cir. 2011). The federal habeas court determines sufficiency of the evidence in reference

18    to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at

19    324 n.16; Chein, 373 F.3d at 983.

20                                         **c. Analysis**

21    After reviewing the state court record in the light most favorable to the jury's verdict, and

22    for the reasons expressed by the California Court of Appeal in affirming petitioner's conviction,

23    this court concludes that there was sufficient evidence introduced at petitioner's trial to support

24    the jury's finding that he acted with premeditation and deliberation. Accordingly, he is not

25    entitled to federal habeas relief on his claim that the evidence was insufficient to show

26    premeditation and deliberation.

27    Petitioner's claim that the evidence introduced at his trial was insufficient to show identity

28    should also be rejected. Although this claim appears to not have been presented to the California

1   Supreme Court therefore rendering it unexhausted (see Resp't's Lod. Docs 3, 6, 8), the court will

2   recommend that federal habeas relief be denied on the merits.  See 28 U.S.C. § 2254(b)(2) ("An

3   application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of

4   the applicant to exhaust the remedies available in the courts of the State").

5        The evidence introduced at petitioner's trial included the following testimony by Angela

6   Smith:  (1) for over an hour, she observed petitioner, Rodriguez, and a third person beat and

7   assault Robert Shetterly, and she saw petitioner hit Shetterly with a piece of wood "over and

8   over;" and (2) "the entire time" Shetterly was being beaten, she was "being raped" by petitioner

9   and the two other men.  (RT at 672-80, 731-35.)  As noted in the opinion of the California Court

10  of Appeal, petitioner was identified as a minor contributor to the DNA evidence collected from

11  Angela Smith.  Viewed in the light most favorable to the prosecution, this evidence was more

12  than sufficient to allow the jury to conclude, as it did, that petitioner was present at the scene and

13  was a participant in the assault against Robert Shetterly.  Accordingly, petitioner is also not

14  entitled to federal habeas relief with respect to this aspect of his insufficiency of the evidence

15  claim.

16            **3.  Witness Coercion**

17       Petitioner next claims that he is entitled to federal habeas relief because the prosecution

18  improperly "coerced" the testimony of Angela Smith by offering her a reduced sentence on drug

19  charges that were pending against her.  (Am. Pet. at 8.)  In this regard, petitioner contends that:

20  (1) Smith committed perjury on the witness stand at his trial and her testimony conflicted with her

21  prior statements to police; (2) Smith was "a drug addict with history;" (3) Smith was under the

22  influence of narcotics at the time of the assault on Robert Shetterly; and (4) Smith's testimony

23  "should had [sic] never been heard due to her credibility and her ability to recall events."  (Id.)

24  Petitioner raised these arguments for the first time in his petition for writ of habeas corpus filed in

25  the California Supreme Court.  (Resp't's Lod. Doc. 8.)  The state high court summarily denied

26  that petition.  (Resp't's Lod. Doc. 9.)

27       The nature of petitioner's federal constitutional claim presented here is not entirely clear.

28  To the extent petitioner is arguing the prosecutor introduced the testimony of Angela Smith,

1   knowing that her testimony was false, petitioner's claim lacks merit and should be rejected.  A

2   violation of a defendant's right to due process occurs if the government knowingly uses false

3   evidence or fails to correct false testimony.  Napue v. Illinois , 360 U.S. 264, 269 (1959); Morales

4   v. Woodford, 388 F.3d 1159, 1179 (9th Cir. 2004).  "To establish a Napue claim, a petitioner

5   must show that '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or

6   should have known that the testimony was actually false, and (3) . . . the false testimony was

7   material.'"  Towery v. Schriro, 641 F.3d 300, 308 (9th Cir. 2010) (quoting United States v. Zuno–

8   Arce, 339 F.3d 886, 889 (9th Cir. 2003)).  Mere speculation regarding these factors is insufficient

9   to meet petitioner's burden.  United States v. Aichele, 941 F.2d 761, 766 (9th Cir. 1991).   In his

10  amended petition before this court petitioner has not specified which portion of Angela Smith's

11  testimony he is claiming was false, if any.  Moreover, he has failed to show that the prosecutor

12  knew or should have known that any of Ms. Smith's trial testimony was false.  Petitioner's vague

13  statement that Smith's testimony at his trial conflicted with her prior statements fails to support

14  the granting of federal habeas relief.

15         Nor is petitioner entitled to federal habeas relief on any claim that the prosecutor failed to

16  disclose exculpatory material to the defense, such as a plea agreement with Angela Smith.

17  The United States Supreme Court has held "that the suppression by the prosecution of evidence

18  favorable to an accused upon request violates due process where the evidence is material either to

19  guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady v.

20  Maryland, 373 U.S. 83, 87 (1963).  See also Youngblood v. West Virginia, 547 U.S. 867, 869

21  (2006) ("A Brady violation occurs when the government fails to disclose evidence materially

22   favorable to the accused").  The duty to disclose evidence favorable to the defense is applicable

23  even though there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107

24  (1976), and encompasses impeachment evidence as well as exculpatory evidence.  United States

25  v. Bagley, 473 U.S. 667, 676 (1985); Gonzalez v. Wong, 667 F.3d 965, 981 (9th Cir. 2011).

26  There are three components of a Brady violation:  "[t]he evidence at issue must be favorable to

27  the accused, either because it is exculpatory, or because it is impeaching; the evidence must have

28  been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

1   Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  See also Skinner v. Switzer, ___U.S. ___, 131

2   S. Ct. 1289, 1300 (2011); Banks v. Dretke, 540 U.S. 668, 691 (2004); Maxwell v. Roe, 628 F.3d

3   486, 509 (9th Cir. 2010).  The rule of Brady v. Maryland applies in a situation where "the

4   undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and

5   that the prosecution knew, or should have known, of the perjury."  Agurs  427 U.S. at 103.

6          Petitioner is not entitled to federal habeas relief on a Brady claim because, as explained

7   above, he has failed to demonstrate that Angela Smith offered false testimony, that any false

8   testimony was material, or that the prosecutor knew any of her testimony was false.  Petitioner

9   has also failed to show that the prosecutor withheld any material exculpatory information from

10   the defense in connection with Smith's testimony.  Petitioner's unsupported assertion that Smith

11   was offered a plea bargain, without more, is insufficient to establish a Brady violation.  In

12   addition, the record reflects that petitioner's trial counsel was well aware that Angela Smith had

13   contacted one of the detectives who had investigated petitioner's case and asked the detective to

14   contact the judge presiding over her case on Ms. Smith's behalf.  (See RT at 716-18.)  Petitioner's

15   counsel was also aware that Ms. Smith's pending probation violation petition was eventually

16   dismissed and the probation condition requiring her participation in a program was eliminated.

17   (Id.)  In fact, petitioner's counsel cross-examined witness Smith regarding these matters at

18   petitioner's trial.  (Id.)

19          Finally, petitioner has failed to show that Angela Smith was coerced in any way to testify

20   against him at his trial.  Even assuming arguendo that Smith was offered some sort of leniency

21   prior to testifying at petitioner's trial with respect to a criminal matter pending against her,

22   petitioner has failed to demonstrate that Smith was forced to testify or that calling her as a

23   prosecution witness somehow violated his rights under the U.S. Constitution.

24          For all of the reasons set forth above, petitioner is not entitled to federal habeas relief on

25   his claim based upon the prosecution's alleged coercion of a witness.

26      **4.  Batson Claim**

27          In petitioner's next ground for relief, he claims that his constitutional rights were violated

28   by the prosecutor's improper use of peremptory challenges to exclude one African American and

one Hispanic from the jury pool at his trial (<u>Batson</u> claim).  (Am. Pet. at 10.)  He argues that "the prosecution dismissed jurors based on race issue."  (<u>Id.</u>)

The California Court of Appeal denied petitioner's <u>Batson</u> claim, reasoning as follows:

> During jury selection, defendant, who is Hispanic, objected to the prosecution's use of its first two peremptory challenges to exclude one African American (C.M.) and one Hispanic (M.S.) juror.  The trial court considered and overruled the objection, finding defendant had failed to make out a prima facie case that the prosecution was engaged in impermissible discrimination.  Defendant renews these claims on appeal.  We find no error.

> "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." (<u>People v. Lenix</u> (2008) 44 Cal.4th 602, 612.)  "There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination.  [Citations.]  To do so, a defendant must first 'make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."'"  (<u>People v. Bonilla</u> (2007) 41 Cal.4th 313, 341.)

> Where, as here, it is unclear "whether [the trial court] applied the correct 'reasonable inference' standard rather than the 'strong likelihood' standard" in concluding defendant did not make out a prima facie case of discrimination, "'we review the record independently to "apply the [reasonable inference] standard and resolve the legal question whether the record supports an inference that the prosecutor excused a juror" on a prohibited discriminatory basis.' [Citations.]"  (<u>People v. Bonilla</u>, <u>supra</u>, 41 Cal.4th at p. 342.)

> "In deciding whether a prima facie case was stated, we consider the entire record before the trial court [citation], but certain types of evidence may be especially relevant:  '[T]he party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group.  He may also demonstrate that the jurors in question share only this one characteristic - their membership in the group - and that in all other respects they are as heterogeneous as the community as a whole.  Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all.  Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.'"  (<u>People v. Bonilla</u>, <u>supra</u>, 41 Cal.4th at p. 342.)

/////

20

Here, the jury, as seated, included at least two Hispanics, two African Americans, and one Filipino.  Thus, the prosecutor neither struck all or most of the Hispanic or African American members from the venire.  The prosecutor questioned C.M. and M.S. in some detail, and defendant does not contend that the prosecutor's questioning of them was cursory or materially different from the questioning of other prospective jurors.   While defendant is Hispanic, there were two Hispanics on the jury.  And, while the victims were white, at least 5 of the 12 jurors were non-white.  Finally, both C.M. and M.S. had characteristics, other than their race, that differentiated them from the community as a whole.  C.M.'s brother had been charged with a crime and spent time in jail.  "[A] prosecutor may reasonably surmise that a close relative's adversary contact with the criminal justice system might make a prospective juror unsympathetic to the prosecution."  (People v. Farnam (2002) 28 Cal.4th 107, 138.)  M.S. was unemployed, which the prosecutor viewed as "a very big red flag . . . ."  A prospective juror's employment status is a permissible, race-neutral basis for a peremptory challenge.  (See Stubbs v. Gomez (9th Cir. 1999) 189 F.3d 1099, 1106; United States v. Brown (7th Cir. 1994) 34 F.3d 569, 572.)

Having considered the entire record, we find that the record does not support an inference that the prosecutor excused either C.M or M .S. on a prohibited discriminatory basis.[7]

(Opinion at 8-10.)

### a.  Legal Standards Regarding Petitioner's Batson Claim

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution.  Batson v. Kentucky, 476 U.S. 79 (1986).  So-called Batson claims are evaluated pursuant to a three-step test.  Rice v. Collins, 546 U.S. 333, 338 (2006).

First, "the defendant must make a prima facie shoring that a challenge was based on race;" second, the prosecution must offer a race-neutral basis for the challenge; and third, the court must determine whether the defendant has shown 'purposeful discrimination.'"

Cook v. LaMarque, 593 F.3d 810, 814 (9th Cir. 2010) (quoting Ali v. Hickman, 584 F.3d 1174, 1180 (9th Cir. 2009)).  See also Jamerson v. Runnels, 713 F.3d 1218, 1223 (9th Cir. 2013).

/////

---

[7]  Because we find the court did not err in concluding defendant failed to make out a prima facie case of discrimination, we decline defendant's invitation to conduct a comparative juror analysis.  (See People v. Howard (2008) 42 Cal.4th 1000, 1020.)

1    In order to establish a prima facie case of racial discrimination, petitioner must show that

2    "(1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a

3    peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference

4    that the strike was motived by race." Boyd v. Newland, 467 F.3d 1139, 1143 (9th Cir. 2006)

5    (citing Batson, 476 U.S. at 96 and Cooperwood v. Cambra, 245 F.3d 1042, 1045-46 (9th Cir.

6    2001)).  A prima facie case of discrimination "can be made out by offering a wide variety of

7    evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory

8    purpose.'" Johnson v. California, 545 U.S. 162, 169 (2005) (quoting Batson, 476 U.S. at 94.)  In

9    evaluating whether a defendant has established a prima facie case, a reviewing court should

10   consider the "'totality of the relevant facts' and 'all relevant circumstances' surrounding the

11   peremptory strike." Boyd, 467 F.3d at 1146 (quoting Batson, 476 U.S. at 94, 96).  This should

12   include a review of the entire transcript of jury voir dire in order to conduct a comparative

13   analysis of the jurors who were stricken and the jurors who were allowed to remain. [8] Id. at 1050

14   ("We believe, however, that Supreme Court precedent requires a comparative juror analysis even

15   when the trial court has concluded that the defendant failed to make a prima facie case").

16   At the second step of the Batson analysis, "the issue is the facial validity of the

17   prosecutor's explanation." Hernandez v. New York, 500 U.S. 352, 360 (1991).  "A neutral

18   explanation in the context of our analysis here means an explanation based on something other

19   than the race of the juror." Id. at 360.  "Unless a discriminatory intent is inherent in the

20   prosecutor's explanation, the reason offered will be deemed race-neutral." Stubbs v. Gomez, 189

21   F.3d 1099, 1105 (9th Cir. 1999) (quoting Hernandez, 500 U.S. at 360).  For purposes of step two,

22   the prosecutor's explanation need not be "persuasive, or even plausible." Purkett v. Elem, 514

23   U.S. at 765, 768 (1995).  Indeed, "to accept a prosecutor's stated nonracial reasons, the court need

24   not agree with them." Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir. 2006).

_____

25   [8]  Comparative juror analysis refers to "an examination of a prosecutor's questions to prospective

26   jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors
     differently because of their membership in a particular group." Boyd, 467 F.3d at 1145.  See also

27   Miller-El v. Dretke, 545 U.S. 231, 241 (2005) (stating that "side-by-side comparisons of some
     black venire panelists who were struck and white panelists allowed to serve" was "more

28   powerful" than bare statistics).

In the third step of a <u>Batson</u> challenge, the trial court has "the duty to determine whether the defendant has established purposeful discrimination," <u>Batson</u>, 476 U.S. at 98, and, to that end, must evaluate the "persuasiveness" of the prosecutor's proffered reasons for the use of peremptory strikes.  <u>See Purkett</u>, 514 U.S. at 768.  In determining whether petitioner has carried this burden, the Supreme Court has stated that "a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'"  <u>Batson</u>, 476 U.S. at 93 (quoting <u>Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 266 (1977)).  <u>See also</u> <u>Hernandez</u>, 500 U.S. at 363.  "[A]ll of the circumstances that bear upon the issue of racial animosity must be consulted."  <u>Snyder v. Louisiana</u>, 552 U.S. 472, 478 (2008).  <u>See also</u> <u>Cook</u>, 593 F.3d at 814 (stating the "totality of the relevant facts" should be considered "to decide whether counsel's race-neutral explanation . . . should be believed.").  Thus, at step three of the analysis, the court "considers all the evidence to determine whether the actual reason for the strike violated the defendant's equal protection rights."  <u>Yee v. Duncan</u>, 463 F.3d 893, 899 (9th Cir. 2006).

The defendant in the criminal prosecution bears the burden of persuasion to prove the existence of unlawful discrimination.  <u>Batson</u>, 476 U.S. at 93.  "This burden of persuasion 'rests with, and never shifts from, the opponent of the strike.'"  <u>Johnson</u>, 545 U.S. at 170 (quoting <u>Purkett</u>, 514 U.S. at 768).  In evaluating habeas petitions premised on an alleged <u>Batson</u> violation, a reviewing court's standard "'is doubly deferential:  unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it.'"  <u>Jamerson</u>, 713 F.3d at 1225 (citations omitted).  "This is because the question of discriminatory intent 'largely will turn on evaluation of credibility' and 'evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.'"  <u>Id.</u> (citations omitted).[9]

---

[9]  "Any constitutional error in jury selection is structural and is not subject to harmless error review."  <u>Williams v. Runnels</u>, 640 F.Supp.2d 1203, 1210 (C.D. Cal. 2010) (citing <u>Windham v. Merkle</u>, 163 F.3d 1092, 1096 (9th Cir. 1998) and <u>Turner v. Marshall</u>, 121 F.3d 1248, 1254 n.3 (9th Cir. 1997)).  <u>See also</u> <u>Gray v. Mississippi</u>, 481 U.S. 648, 668 (1987) (stating that among those constitutional rights so basic "that their infraction can never be treated as harmless error" is a defendant's "right to an impartial adjudicator, be it judge or jury") (citation and internal

1

**b. Analysis**

2

The issue presented in this case is whether the state court's conclusion that petitioner

3

failed to establish a prima facie case of racial discrimination in connection with the prosecutor's

4

challenge to prospective jurors C.M. and M.S. is contrary to or an unreasonable application of

5

Batson and its progeny.

6

Here, prospective jurors C.M. and M.S. were members of a "cognizable racial group" and

7

the prosecutor used peremptory challenges to remove them from the jury, thereby satisfying the

8

first two prongs of the Batson test with respect to the establishment of a prima facie case of racial

9

discrimination.  However, for the following reasons, this court concludes that the totality of the

10

circumstances do not raise an inference that the prosecutor's use of peremptory challenges on

11

these two prospective jurors was motived by race.

12

After defense counsel objected to the prosecutor's challenges to C.M. and M.S., the trial

13

court asked the prosecutor to explain his reasons for striking these prospective jurors before

14

deciding whether a prima facie case of discrimination had been made.  (Augmented Reporter's

15

Transcript (ART) at 210.)[10]  The prosecutor explained that when he tried to question C.M. about

16

her brother's criminal matter, she was hesitant to explain any details and failed to make eye

17

contact with him.  (Id. at 211.)  The prosecutor also stated that he noticed that when he was

18

questioning other jurors, C.M. "would be looking off kind of to the left and down a lot, and I

19

---

20

quotations omitted); Williams v. Woodford, 396 F.3d 1059, 1072 (9th Cir. 2005) ("because a

21

Batson violation is structural error, actual harm is presumed to have resulted from the alleged
constitutional violation").

22

[10]  Specifically, the trial judge asked the prosecutor:  "Well, why don't you share your reasons."

23

(Id.)  When the prosecutor asked whether the court was "finding a prima facie case at this point,"
the judge answered, "No, but I'm asking for you to share your reasons for kicking them."  (Id.)

24

At least one court has suggested that a reviewing court "should not even consider the prosecutor's
unsubstantiated explanations at the stage of determining whether a prima case exists."  Fernandez

25

v. Roe, 286 F.3d 1073, 1079 (9th Cir. 2002) (citing United States v. Alvarado, 923 F.2d 253, 255

26

(2d Cir. 1991)).  However, in this case most of the prosecutor's stated reasons for striking jurors
C.M. and M.S. can be substantiated by the record of the voir dire, which has been lodged with

27

this court.  Accordingly, the court will consider the prosecutor's stated reasons as part of the
totality of relevant circumstances in determining whether petitioner has shown a prima facie case

28

of racial discrimination.

1    would kind of go back to her because I didn't think she was paying attention." (Id.)  The

2    prosecutor stated that he believed that C.M. was "holding things back," and he "didn't feel that

3    she related to [him] well" or "there might have been some kind of hostility there." (Id.)  The trial

4    judge agreed with the prosecutor that C.M.'s responses to the voir dire questions about her

5    brother were somewhat cursory and that she had failed to make eye contact when providing those

6    responses.  (Id. at 214.)

7         Of course, the bare record before this court does not disclose the demeanor of the jurors.

8    However, because a juror's demeanor cannot be gauged from a transcript, federal courts generally

9    defer to the state trial court's evaluation of whether a prosecutor genuinely relied on a juror's

10   demeanor in exercising a peremptory challenge.  Snyder, 552 U.S. at 479.  In any event, the state

11   court record does support the prosecutor's expressed opinion that prospective juror C.M.'s

12   responses to questions about her brother's criminal conviction were somewhat evasive and

13   abrupt.  (Id. at 194-96.)  "Excluding jurors because of . . . a poor attitude in answer to voir dire

14   questions is wholly within the prosecutor's prerogative." United States v. Thompson, 827 F.2d

15   1254, 1260 (9th Cir. 1987).  Further, a prosecutor's reasons for excusing a juror may be "founded

16   on nothing more than a trial lawyer's instincts about a prospective juror." Id.

17        With regard to prospective juror M.S., the prosecutor stated that the fact M.S. was

18   unemployed was "a very big red flag." (ART at 212.)  The prosecutor also noted that M.S. stated

19   that he "had a problem judging people," which raised another red flag as to "whether or not he

20   would be able to pass judgment in this case." (Id.)  Finally, the prosecutor mentioned that M.S.

21   had failed to appear for a "red light ticket." (Id.)  He explained that this "raises red flags, in my

22   mind, about . . . which side he was leaning towards." (Id. at 213.)  Again, the prosecutor's

23   statements regarding M.S.'s responses to voir dire questions are fully supported by the record

24   before this federal habeas court.

25        Moreover, a comparative juror analysis fails to support petitioner's claim that the

26   prosecutor's decision to strike M.S. and C.M reflected a discriminatory intent.  A review of the

27   jury voir dire reflects that Juror M.S. was the only potential juror who was unemployed but not

28   retired.  In this regard, M.S. responded that he "tried to be a homemaker" and was "a machinist

1   prior to that ten years ago." (Id. at 140.)  As noted by the California Court of Appeal, a

2   prospective juror's employment status is a permissible, race-neutral basis for the exercise of a

3   peremptory challenge.  See Stubbs v. Gomez, 189 F.3d 1099, 1106 (9th Cir. 1999); United States

4   v. Brown , 34 F.3d 569, 572 (7th Cir. 1994).  M.S. also appeared confused when the prosecutor

5   asked whether any juror had "religious or philosophical beliefs that would prevent them from

6   sitting here and rendering judgments in this case." (ART at 167, 168.)  Specifically, in response

7   to that voir dire question M.S. asked, "in what capacity do you mean will it effect?  You know,

8   my religious beliefs or – I happen to be honest at all times." (Id. at 168.)  No other juror appeared

9   to be confused by this question.  Although two other prospective jurors stated they might have

10  trouble "judging people" because they were Jehovah's Witnesses, (id. at 167-69), the prosecutor

11  used a peremptory challenge to strike one of those jurors as well.  (Id. at 218.)

12      It is true that several prospective jurors had appeared in court after receiving tickets.  (Id.

13  at 181-83.)  However, M.S. was the only juror who failed to appear in court as ordered in

14  connection with such a ticket.  (Id. at 181-81, 188.)  M.S. stated he was "in the hospital getting a

15  liver transplant at that time." (Id. at 188).  When explaining his strike of M.S., the prosecutor

16  stated, "He said that was because of his medical condition and that may be and I have no way of

17  verifying that at this point.  But just the fact that he was ordered to appear by a court, and that he

18  didn't appear raises red flags, in my mind." (Id. at 212-13.)  Although the transcript of jury voir

19  dire reflects a somewhat cursory exchange between the prosecutor and the prospective jurors,

20  there is no evidence that jurors with characteristics similar to M.S. were allowed to serve on the

21  jury, so as to raise an inference that prospective juror M.S. was stricken by the prosecutor simply

22  because he was Hispanic.  The answers given by M.S. reflected that, unlike other jurors, he was

23  unemployed, was confused about the concept of fairly judging others, and had failed to appear in

24  court on a traffic ticket.  There were no other prospective jurors with those same combined

25  characteristics who were allowed to serve on petitioner's jury.

26      Juror C.M., along with several other jurors, had relatives who had been charged with a

27  crime.  (Id. at 165-66.)  All of them stated their relatives had been treated fairly.  (Id.)  Upon

28  questioning by the prosecutor, one juror stated she had talked to her relative about the experience,

1   that he was in the wrong, and that she "guessed" he had been treated fairly.  (Id. at 182.)  Another

2   juror explained that her sister's former husband had been charged with domestic violence and

3   child endangerment, that she had come to court with her sister, but that the charges had eventually

4   been "dropped."  (Id. at 189.)   This juror further stated that, although her former brother-in-law's

5   matter involved a credibility contest between witnesses, this would not prevent her from reaching

6   a verdict without "a whole lot of physical evidence."  (Id. at 190.)  However, when the prosecutor

7   asked C.M. about her brother's criminal matter, she gave one-word answers, professed not to

8   have an opinion as to whether justice was served in her brother's case, and yet claimed that she

9   had never spoken to her brother about the situation.  (Id. at 195-96.)   In light of the fact that

10   C.M.'s responses to the prosecutor's questions about her brother's criminal conviction were

11   significantly different in tone and substance from the responses given by other jurors on the same

12   subject, the prosecutor's decision to exercise a peremptory strike against C.M. for this reason

13   does not raise an inference of discrimination.  This court also notes that the prosecutor struck

14   another juror whose relative had been charged with a crime.  (Id. at 218.)

15          The California Court of Appeal noted that "the prosecutor questioned C.M. and M.S. in

16   some detail, and defendant does not contend that the prosecutor's questioning of them was

17   cursory or materially different from the questioning of other prospective jurors."  (Opinion at 9.)

18   The state court record supports this conclusion reached by the state appellate court.  (See, e.g.,

19   ART at 194-96, 199-200.)  The prosecutor's questions were fairly distributed among all of the

20   jurors, and he did not exercise peremptory challenges to strike C.M. and M.S. without questioning

21   them about red flags that he perceived in their responses to voir dire questions.  (Id. at 167-69,

22   195-96.)  Cf. Miller-El, 545 U.S. at 244 ("[T]he state's failure to engage in any meaningful voir

23   dire examination on a subject the State alleges [causes it concern] is evidence suggesting that the

24   explanation is a sham and a pretext for discrimination."); United States v. Collins, 551 F.3d 914,

25   922 (9th Cir. 2009) (finding an inference of discrimination based, in part, on the prosecutor's

26   failure to ask a juror questions on the topic that allegedly served as a basis for striking the juror);

27   Green v. LaMarque, 532 F.3d 1028, 1033 (9th Cir. 2008) (finding the prosecutor's race-neutral

28   reasons to be pretextual because, in part, "[t]he prosecutor's stated reason that [the struck juror]'s

1    five jobs illustrated she could not get along well with others was undermined by the fact that he

2    did not ask her a single question about why she changed jobs"); Fernandez, 286 F.3d at 1079 (the

3    fact that the prosecutor fails to "engage in meaningful questioning of any of the minority jurors"

4    may support an inference of discrimination).[11]

5         In considering the "totality of relevant facts," a reviewing court may also conduct a

6    statistical analysis of the number of minority jurors stricken out of the total number of minority

7    jurors on the panel.  Miller-El, 545 U.S. at 240.  Here, after excusing M.S. and C.M., the

8    prosecutor exercised another peremptory challenge without a defense challenge being used.

9    (ART at 218.)  After the defense excused another juror, the prosecutor passed.  (Id. at 218-19.)

10   The defense excused another juror, and the prosecutor then passed again.  (Id. at 219.)  The

11   defense then excused another juror and the court called seven additional names to fill the vacant

12   seats on the jury.  (Id.)  After questioning these new jurors, the prosecutor and the defense both

13   passed.  (Id. at 248.)  At that point, the jury was complete.  (Id.)

14        The trial judge then proceeded to select alternate jurors.  (Id.)  The prosecutor exercised

15   one peremptory challenge during that phase of jury selection, but thereafter passed until all of the

16   alternate jurors were chosen.  (Id. at 249-251.)  Although the race of the jurors is not apparent

17   from the record, assuming that the jurors excused by the prosecutor who are not the subject of

18   petitioner's Batson claim were not members of a minority group, the prosecutor excused two

19   minority jurors and two white jurors in total.

20        The trial court noted that there were eight minority jurors and nine white jurors on the

21   panel at the time the prosecutor exercised peremptory challenges on C.M. and M.S.  (Id. at 213-

22   14.)[12]  The prosecutor excused two out a total of eight minority jurors, or one-fourth of the total

23   number of minority jurors, on a panel that was comprised of approximately one-half minorities.

24   _____

25   [11]  It is true that the prosecutor did not get a further explanation from M.S. about his failure to
     appear in court on his traffic ticket, but this court does not find that fact, standing alone, supports

26   an inference of discrimination.

27   [12]  The court also stated that there were approximately seventy prospective jurors in the audience,
     but he was unable to count "how many were African American, how many were white[.]"  (Id. at

28   214.)  However, the trial judge noted that the venire "appear[ed] to be diverse."  (Id.)

1    This figure is not sufficient to demonstrate an inference of discrimination.  Cf. Williams v.

2    Runnels, 432 F.3d 1102, 1107 (9th Cir. 2006) (defendant established an inference of racial

3    discrimination under Batson based on statistical analysis alone, where defendant was African–

4    American, the prosecutor used three of his first four peremptory challenges to remove African–

5    Americans from the jury panel and only four of the first forty-nine potential jurors were African–

6    American); United States v. Alcantar, 832 F.2d 1175, at 1177 (9th Cir. 1987) (prima facie

7    showing where prosecutor challenged all three Hispanics in the jury pool); Thompson, 827 F.2d

8    at 1256-57 (prima facie case existed where the prosecutor used four peremptory challenges to

9    exclude all four blacks in the jury pool).

10        Petitioner's jury, as seated, included at least two Hispanics and two African Americans.

11    (Opinion at 9.)  As noted by the California Court of Appeal, "the prosecutor neither struck all or

12    most of the Hispanic or African American members from the venire."  (Id.)  "[T]he willingness of

13    a prosecutor to accept minority jurors weighs against the findings of a prima facie case."  United

14    States v. Chinchilla, 874 F.2d 695, 698 n.4 (9th Cir. 1989).  See also United States v.

15    Montgomery, 819 F.2d 847, 851 (8th Cir. 1987) (no prima facie case where the government (1)

16    accepted a jury which included two blacks; (2) could have used its remaining peremptory

17    challenges to strike these remaining blacks; and (3) did not attempt to exclude all blacks, (or as

18    many blacks as it could); United States v. Ratcliff, 806 F.2d 1253, 1256 (5th Cir. 1986) ( no

19    prima facie case of purposeful discrimination where although one black juror was struck, two

20    blacks remained on jury); United States v. Dennis, 804 F.2d 1208, 1210-11 (11th Cir. 1986) (no

21    inference of purposeful discrimination where three black jurors were excluded by the prosecution,

22    but two blacks remained on jury).

23        The only other factor that could even arguably raise a possible inference of bias on the

24    part of the prosecutor in this case is that C.M. and M.S. are members of a minority group.

25    However, membership in a minority group, standing alone, is insufficient to establish a prima

26    facie case of purposeful discrimination on the basis of race or gender in the exercise of

27    peremptory challenges.  Wade v. Terhune, 202 F.3d 1190, 1198 (9th Cir. 2000) ("the fact that the

28    /////

1    juror was the one Black member of the venire does not, in itself, raise an inference of

2    discrimination.").

3          Finally, the fact that the California Court of Appeal declined to engage in a comparative

4    juror analysis in rejecting petitioner's <u>Batson</u> claim does not render its decision an unreasonable

5    application of clearly established federal law.  <u>Jamerson</u>, 713 F.3d at 1225 n.1  ("[E]ven if the

6    trial court and the California Court of Appeal did not engage in comparative juror analysis, where

7    the relevant evidence is found in answers to juror questionnaires and a transcript of voir dire . . .

8    [s]ection 2254(d)(2) . . . applies.")  Accordingly, review under the AEDPA's deferential standard

9    applies here.  <u>Id.</u>  The California Court of Appeal applied the correct legal standard in rejecting

10   petitioner's <u>Batson</u> claim.  <u>See</u> <u>Johnson</u>, 545 U.S. at 170; <u>Terhune</u>, 202 F.3d at 1195-97 (<u>Batson</u>

11   requires that "the defendant must demonstrate that the facts and circumstances of the case 'raise

12   an inference' that the prosecution has excluded venire members from the petit jury on account of

13   their race.")  Furthermore, upon review of the relevant state court record, this court concludes that

14   the prosecutor's use of peremptory challenges to excuse prospective jurors C.M. and M.S. did not

15   raise an inference of discriminatory bias on the part of the prosecutor.  The decision of the

16   California Court of Appeal to the same effect was not contrary to or an unreasonable application

17   of clearly established federal law, nor was it based upon an unreasonable determination of the

18   facts of this case.

19         Accordingly, petitioner is not entitled to federal habeas relief on his <u>Batson</u> claim.[13]

20         **5.  Request to Reopen Closing Argument and Jury Instructions**

21         In his final two grounds for relief, petitioner claims that the trial judge violated his federal

22   constitutional rights in denying his request to "reopen jury instructions" and permit further

---

23   [13]   The court notes that although the trial judge did not find a prima facie case of racial
     discrimination, he did ask the prosecutor to explain his reasons for excusing jurors C.M. and
24   M.S., and evaluated the credibility of those stated reasons before making his ruling.  The judge
     explained that he did not find a prima facie showing with regard to C.M. but, "if there was, your
25   reasons for kicking her, I understand now that you said them."  (ART at 214.)  With respect to
     M.S., the judge simply found no prima facie case after listening to the prosecutor's reasons for
26   striking that juror.  (<u>Id.</u> at 215.)  Assuming arguendo that the trial court moved on to the third step
     of the <u>Batson</u> analysis with respect to the prosecutor's peremptory strike of C.M. and M.S.,
27   petitioner is still not entitled to federal habeas relief.  For the reasons set forth above, petitioner
     has failed to meet his burden with respect to his <u>Batson</u> challenge both at the first and the third
28   stage of that analysis.

closing argument in order to clarify the concept of aiding and abetting for the jury.  (Am. Pet. at

12, 14.)  Petitioner argues that the jury's verdict reflected that it was confused about the concept

of aiding and abetting.  (Id. at 12.)  He argues that the trial court "prejudicially abused its

discretion in not giving a clear understanding of the jury's concern about aiding and abetting."

(Id.)

      The California Court of Appeal rejected these arguments, reasoning as follows:

> Defendant next claims that the trial court erred in denying his request to reopen closing argument.  We are not persuaded.

> During deliberations, the jury asked a number of questions concerning the law of aiding and abetting.  On the fifth day of deliberations, the jury asked, "Does aiding and abetting apply to the great bodily injury finding or must the person directly (personally) inflict the injuries?"  The court responded that "Aiding and Abetting does not apply to the [section] 12022.7 Great Bodily injury finding" and referred the jury to "CALCRIM Instruction 3160 for the elements needed to find great bodily injury."

> On the sixth day of deliberations, the jury asked in pertinent part: "Do CALCRIM 400 and 401 apply to Count # 1 [attempted murder]?  Can we find a defendant guilty of attempted murder based on aiding and abetting?"  The court responded in pertinent part:  "Yes, CALCRIM 400 and 401 Aiding and Abetting apply to Count 1 Attempted Murder.  [¶]  Yes, you can find a defendant guilty of Attempted Murder based on Aiding and Abetting as long as the necessary elements to the crime have been proved beyond a reasonable doubt."

> On the seventh day of deliberations, the jury asked:  "For Count # 1 [attempted murder], if we find the defendant guilty by aiding and abetting, does the additional finding of 'willful, deliberate and premeditated' apply toward the aiding and abetting or to the attempted murder itself?  Did the defendant premeditate aiding and abetting or attempted murder?"  After some discussion between the court and counsel about how to respond to the jury's question, Rodriguez's counsel asked "to reopen [closing] argument . . . so we can, at least through our eyes, try to explain what we believe aiding and abetting means."  Defendant's counsel joined in the request, noting that "the jury does seem confused on the aider and abettor theory."  The court denied the request, stating, "You had the chance to argue aiding and abetting during your closing arguments.  Whether you chose to do it or not was up to you."  With counsels' approval, the court sought clarification from the jury by submitting the following written questions:  "Are you asking if an aider and abettor theory can apply to the special finding of willful, deliberate and premeditation?  [¶]  And are you asking what the intent of an aider and abettor must be to find the attempted murder was willful, deliberate and premeditated under an aiding and abetting theory?"  The jury responded, "Yes," to the first question, and the court

31

responded:  "The theory of aiding and abetting also applies to the special finding of whether the attempted murder was willful, deliberate, and premeditated."

While the court had the discretion to reopen closing argument, it did not abuse its discretion in refusing to do so here.  (See People v. Young (2007) 156 Cal.App.4th 1165, 1171-1172 (Young).)  In Young, the jury advised the court that it was deadlocked and that "it was unclear whether 'there's 100 percent understanding from everyone in the box . . . how the lesser charges work with the robbery.'"  (Id. at p. 1170.)  The court referred the jury to the instructions, and the foreperson responded that "the problem appeared to be a disagreement on 'the perception of the facts' and [he] did not believe any additional time would be helpful in reaching a verdict."  (Ibid.)  The rest of the jury agreed that neither additional time nor instruction would be helpful.  (Ibid.)  The court asked whether further argument from the attorneys might be helpful, and some of the jurors indicated that it would be.  (Ibid.)  Accordingly, the court reopened closing argument for both parties.  (Ibid.)  In determining that the trial court acted within its inherent authority and did not abuse its discretion in reopening closing argument, we explained, "There is authority guiding the trial court's actions with respect to the order of a jury trial and its obligations upon being faced with a deadlocked jury.  Section 1093 delineates the order that trial procedures shall follow, including the direction that the prosecutor and defense counsel may argue the case to the court and jury upon the close of evidence.  (§ 1093, subd. (e).)  Section 1094 grants the trial court broad discretion to depart from the order specified in section 1093.  Section 1140 entitles the trial court to ascertain whether there is a reasonable probability a jury deadlock might be broken.  [Citations.]  When the court is faced with a deadlocked jury, it must proceed carefully, lest its actions be viewed as coercive.  [Citation.]  At the same time, when faced with questions from the jury, including that they have reached an impasse, 'a court must do more than figuratively throw up its hands and tell the jury it cannot help.  It must at least consider how it can best aid the jury.'  [Citation.]"  (Id. at pp. 1171-1172, fn. omitted.)  "By asking if additional argument might be helpful, the court did no more than ascertain the reasonable probability of the deadlock being broken and a means by which that might be accomplished.  When some of the jurors agreed additional argument might help them in reaching a verdict, it was not inappropriate for the court to seek to offer that alternative to aid the jury."  (Id. at p. 1172.)

Conversely, here, the jury had not advised the court that it was deadlocked.  Moreover, the jury's questions indicated that it needed additional guidance on the law of aiding and abetting, not that there was disagreement on the facts or the law's application thereto.  It cannot seriously be disputed that it is for the trial court, not counsel, to instruct the jury as to questions of law.  (People v. Baldwin (1954) 42 Cal.2d 858, 871.)  The court did so here, and defendant does not question the accuracy of the court's instructions or responses to the jury's questions.  The trial court did not abuse its discretion in refusing to allow defendant, through his counsel, to argue the law.  (Ibid.)

1  (Opinion at 14-17.)

2         The essence of petitioner's final two claims for relief is that the trial court abused its

3  discretion under state law in failing to reopen the trial proceedings in order to clarify for the jury

4  the concept of aiding and abetting.  However, even if the trial court did erroneously apply state

5  law in following this course of action, the decision of the California Court of Appeal rejecting this

6  state law claim is binding on this court and may not be challenged in this federal habeas corpus

7  proceeding.  Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009) ("we have repeatedly held

8  that 'it is not the province of a federal habeas court to reexamine state-court determinations on

9  state-law questions"); Rivera v. Illinois, 556 U.S. 148, 158 (2009) ("[A] mere error of state law

10  . . . is not a denial of due process") (quoting Engle v. Isaac, 456 U.S. 107, 121, n. 21 (1982) and

11  Estelle, 502 U.S.at 67, 72-73); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("a state court's

12  interpretation of state law . . . binds a federal court sitting in federal habeas"); Lewis v. Jeffers,

13  497 U.S. 764, 780 (1990) (federal habeas corpus relief does not lie for errors of state law;

14  Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) ("[F]ailure to comply with the state's

15  rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief.").

16         Here, petitioner has failed to cite any authority for the proposition that a criminal

17  defendant's federal constitutional rights are violated by the failure of a trial court to give further

18  jury instructions or to allow further argument on an issue after jury deliberations has begun, even

19  if it appears the jury is confused.  On the contrary, a jury is presumed to follow the court's

20  instructions, Richardson v. Marsh, 481 U.S. 200, 211 (1987), and is also presumed to understand

21  a trial judge's answer to its questions.  Weeks v. Angelone, 528 U.S. 225, 226 (2000).  There is

22  also no evidence before the court in this case that petitioner's trial was rendered fundamentally

23  unfair because of the trial court's failure to clear up any misunderstanding about the legal concept

24  of liability based on an aiding and abetting theory.  See Kennick v. Superior Court, 736 F.2d

25  1277, 1280 (9th Cir. 1984) ("Absent arbitrary or discriminatory action . . . a mistake of state law

26  does not constitute a due process violation[.]")

27  /////

28  /////

1    The decision of the California Court of Appeals rejecting these claims of trial court error

2  is not contrary to or an unreasonable application of clearly established federal law.  Accordingly,

3  petitioner is not entitled to federal habeas relief.

4  **III. Conclusion**

5    For all the reasons set forth above, IT IS HEREBY RECOMMENDED that petitioner's

6  application for a writ of habeas corpus be denied.

7    These findings and recommendations are submitted to the United States District Judge

8  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

9  after being served with these findings and recommendations, any party may file written

10  objections with the court and serve a copy on all parties.  Such a document should be captioned

11  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

12  shall be served and filed within fourteen days after service of the objections.  Failure to file

13  objections within the specified time may waive the right to appeal the District Court's order.

14  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

15  1991).  In his objections petitioner may address whether a certificate of appealability should issue

16  in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing

17  Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

18  enters a final order adverse to the applicant).

19  Dated:  October 28, 2013

20

21                                    _Dale A. Drozd_

22                                    DALE A. DROZD
                                     UNITED STATES MAGISTRATE JUDGE

23  DAD:8
    Arteaga3181.hc

24

25

26

27

28

34